The principal issue which we address in the appeal is the issue of preemption. The claims that were made in this case by the plaintiff were claims that he was damaged because of the unlawful copying and distribution of his copyrighted motion pictures. The pleadings in the case said that that action, the unlawful copying and distribution of those films, resulted in two separate damage claims to which he was entitled. One was infringement of his copyrights. The other was the misappropriation of his right of publicity under California law. There is no difference between what is claimed as a violation of copyright and what is claimed as a violation of his California rights of publicity. Your position basically is a catch-22, isn't it? You're really saying that this is preempted by copyright law and he blew his copyright, so he's out, despite the fact that your client, I think without question, counterfeited or copied these videos and distributed them, correct? Well, Your Honor, if I may, the issue of preemption and the issue of how the copyright aspects of the case were handled are really quite different. I don't think that the question of preemption turns on the other issues in the case. The issue of preemption, it seems to me, is a matter of rather clear statutory I'm with you on that. I mean, I'm just saying that your basic position in the litigation is that this is preempted by copyright law. And he doesn't have a copyright because it was a work-for-hire. The company doesn't have a copyright, and therefore there's no copyright protection. And so he's out of the box altogether because he doesn't have a right to publicity claim because it was preempted. So basically you're saying these films or works of art or whatever you want to call them are in the public domain and anybody can copy them and exploit them, regardless of the fact that they were otherwise copyrighted. No, sir. I'm not suggesting they're in the public domain at all. The proper activity, the proper registration with respect to the copyrights can be taken any time. It can be taken next week or at any time. It is, however, that registration is a prerequisite to a plaintiff coming into a federal district court and seeking enforcement of his copyrights. It is a statutorily mandated prerequisite to a copyright infringement action. I think I'm willing to go along with you so far as you go with your argument that this is copyright and copyright preempts. I'm having trouble, however, with your argument that this is an invalid registration because the registration was entered in the name of the individual. Can you help me? Let me give you my sense as to how I think this should be answered so you know what you're responding to. The statute clearly says that if it's a work-for-hire, the hiring authority has to have a written statement giving over the copyright to the person who performed the work. But that is dependent upon it being a work-for-hire. Ordinarily, we run into these disputes when there's a fight between the company employing the writer or the artist and who actually has the copyright. Here, of course, there's no such fight because the individual is the sole owner of the corporation. So there's never going to be a fight between them as to who owns it. It's one and the same for that purpose. Given that, why isn't it the appropriate way to interpret what's going on here as this was not a work-for-hire because it was not within the contemplation of the parties that the copyright would be with the corporation rather than with the individual? Do you get the drift in the area I'm asking you to respond to? And I apologize for answering this way, but I remember when I sat in my very first law school class, I remember the professor who told me this story. He said, there will be times when you will be dealing with a case involving a large corporation on the one hand and a widow on the other. And you'll feel as if with every fiber of your being, you want to protect this lady. But the law is with the corporation. In this particular instance, what you're, I think, toiling with is the fact that you see a fellow who has been wronged. Well, not really. I'm just trying to read the statute. I'll read the statute to you, and then we can work from there. It says, a work prepared by an employee within the scope of his or her employment, that's what a work made-for-hire is. And then later on in the statute, it says, if it is a work made-for-hire, the transfer from the employer or from the company to the employee has to be in writing. But in order for it to be a work made-for-hire, it has to be within the scope of his or her employment. My question to you is, why can't we look at the relationship between this individual who owns the company and is employed by the company, given the fact that he himself decided to register the copyright, that this was not a work for hire within that definition? Because, in fact, that is not what happened. In fact, these works were treated in all respects as works for hire. Except for the fact that he registered copyright in his own name. But he explained that. He explained that. He registered copyright in his own name because he wanted to make certain that if his company fell into financial difficulties, that he could keep the assets.  Well, no. What he seems to be saying is, when I made this deal with my own company, I knew what the copyright law was. I knew that if I was doing certain things within the scope of my employment or without the scope of my employment, they would be works for hire or not, depending upon how I characterized that. But, you see, if he knew what the law was, all he had to do was what the statute mandates, have a little note somewhere in his file. But that assumes that it's a work for hire. It assumes. There's no question that he's an employee. Correct. He is a full-time, salaried employee of the company. Correct. He is an employee both as a performer in his films and as the president of the company. The company was designed for the purpose of producing motion pictures. Let me ask you this, and this may help clarify. What if there had been a written contract? There was not such a written contract as I'm about to hypothesize. But what if there had been a written contract that says, you are an employee of the company for purposes of W-2s, all kinds of, there are lots of reasons why he would want to be an employee rather than an independent contractor. You are an employee of the company. However, for purposes of copyright, the works that are produced are not within the scope of the employment relationship. He would have then complied in every respect with the copyright act. So the question is, why can't we look at the relationship between him and his company with respect to these and say that's not within the scope of the employment? It's very clear that the statute requires that it be in writing in order, once it is a work for hire. But this is a question that determines whether it's a work for hire. So I don't think that has to be in writing. I think the fact is that, again, you're trying to reach a particular result by simply having this fall within a particular crack. Well, of course they are. I mean, I'm trying to figure out the two positions. I fully understand. I think that in this particular instance, the issue of whether something is a work for hire to some degree is a matter of ferreting out the intent of the two parties to this agreement. Sure. They acknowledge even in their briefs that the only agreement which existed was an oral agreement. And they clearly understand that the statute mandates a written agreement. The statute mandates a written agreement only if it is a work for hire. The statute says nothing about whether you need a written agreement in order to determine whether it is a work for hire. Well, I agree. I agree. But the fact is that you then must address the relationship of the parties in terms of what was their intent. Exactly. And I think it is easy to look at the various activities of the parties and ascertain what that intent was. The business of the company was to produce movies. All of the costs connected with the production of those movies was borne by the company. All of the people engaged by the company to perform services in connection with the film were paid by the company. Let's hear right about all that. Why doesn't it all get swashed out on the lamps plus because there was no attempt to defraud the copyright office? I believe there was an attempt to defraud. And let me, it's interesting because I know you believe that, but what, you know, I understand how the copyright office could have been defrauded here. I mean, let's say you're right. They should have done it. It should have been because it was a work for hire, but they didn't. If there's just a mistake, if there's no attempt to defraud, it winds up washing out. So why isn't this runner, I think, washed out on the lamps? Plus my answer to the question is this. What I I watched happen was Mr. Gasper realized at some point that he had just made a mistake. OK. He had taken steps that he shouldn't have taken and he knew he had compromised his position. There's little question that if he had come to the district court at that time and said, May I call? I made a mistake and I asked this court to assist me in remedying that mistake. I asked this court to recognize that I made an inadvertent error and I shouldn't be forced to suffer. Cases throughout the various circuits have held. OK. You make an inadvertent mistake. You shouldn't be held to that strict standard. Precisely, I think, the point your honor is making. But in this particular instance, he didn't stop with that. In fact, he never asked for assistance in remedying his mistake. Instead, he conjured up a perjured account of what occurred. And he compounded his initial registration, which he described as intentional, not inadvertent. He compounded it with a group of, I don't want to sound too strident in calling or emotional in calling them lies, but the simple truth was that the district court. I'm still waiting for my answer. I mean, you've been a long ways in talking about stuff that I don't see makes any difference. Well, your honor. Do you remember the question I asked you? Yes. And, you know, you just go a long way sort of meandering and, you know, saying what he should have done He should have asked for help. He should have kneeled. He should have, you know, chewed the wafer. I mean, I don't know what any of this has to do with it. Our cases say, look, if there's no attempt to defraud the copyright office, it doesn't matter. Even if he was wrong, he shouldn't have done something else. Unless it was an attempt to defraud the copyright office, the mistake in registration doesn't make any difference. And you heard the question and then you went off on something else he should have done in district court and things he told the district court. You remember the question? Yes, sir, I do. Fraud on the copyright office. Okay, that's the test. What happens in district court doesn't matter. If there was some effort to defraud district court or some perjury or anything of that sort, we have ways of dealing with that, but has no bearing on this issue. The question is whether he's trying to defraud the copyright office. And you spend a lot of time talking about stuff that doesn't answer that question. Now, with that question in mind, what is there here to show for the copyright office, if anything? Your Honor, the individual involved testified under oath that he intentionally, intentionally, misstated the application for the purpose of producing a result that was different from what the law would have created had he done it properly. The reason I addressed his actions in the court was not at all to meander or to avoid your question. Your question was, I suppose, at the very center. Get to the point. I still don't understand what you're saying. He said, look, I meant to do this. I thought that's what I was supposed to do, and I did intentionally do that. So where's the fraud on the copyright office here? He said, I intentionally did this for the purpose of changing what the Copyright Act would otherwise have resulted. Which was what? Which is that had he registered them properly as works for hire, they would have been owned by the corporation, and he could have dealt with that very simply by simply creating a writing between the two parties. So your answer to Judge Kaczynski's question is very simple. He defrauded the copyright office by registering it in his name rather than his employer's. That's correct. Simple answer. I apologize. I didn't. If that was the answer you were looking for, I apologize. No, that's your answer. I don't understand how that's fraud. Well, I think when someone. I mean, where is the, what benefit does he get that he wouldn't otherwise get by registering one way or the other? I mean, he's mistaking about what the effects are of what he's doing. He's mistaking about how he could deal with the question. But where's the fraud on the copyright office? Your Honor, fraud as I understand it is defined as someone intentionally misrepresenting a fact and causing someone else to rely on that fact and take a particular course of action. In this case, he misrepresented the authorship of the work. He did it with the sole intention of causing the copyright office to register and create a prima facie. Was this submitted to the jury? Was this question submitted to the jury? The issue of whether or not there was ownership of the copyright was submitted to the jury. Why isn't that the end of your case? You know, you could take the same set of facts and find fraud on the copyright office. Maybe, maybe. Or you could find otherwise. The jury found otherwise. The issue of whether there was fraud on the copyright office was not submitted to the jury. Did you ask for it to be submitted? No. So it's either been resolved against you or it's been waived. If you don't, if you don't submit it to the jury because you haven't asked for an instruction, then it's waived. Was it in your 50A motion? The 50A motion, Your Honor, was declined by the court. I know, but was it preserved, I guess? As this case progressed, and as I'm sure the court can see, there are any number of convoluted issues that address the conduct of the trial. The issue of standing was addressed pre-trial. In fact, the court made a sua sponte order dismissing the plaintiff's copyright issues or claims. That order was reversed on the first day of trial. The parties, frankly, didn't know where they stood. This was the third judge to handle the case. That's correct. We asked the court to, one of the representations that Mr. Gaspar's counsel made to the court at that time was, we believe that Mr. Gaspar's a beneficial owner of a copyright under the Silvers case, and as a result of the fact he's entitled to a royalty from its exploitation. And the court said, okay, I'll wait. If you prove that in your principal case, I'll go along. If you don't, I'll listen to a motion at the conclusion of the plaintiff's case. At the conclusion of the case, we addressed the court and said, Your Honor, we would like to make a motion regarding the various issues that, in our opinion, established that this case was not presented in a way that establishes a prima facie case. He said, I will not hear a motion to this time. I will not. Well, this court in its order finds Gaspar made a grave mistake in listing himself as the author. Grave mistake. This is on page 6 of the order. Yes, sir. Is there a finding that it's not fraud? Mistake as opposed to fraud? I believe that the court felt, for me to put myself in the... We don't deal in feelings here. We deal in findings. The point is, for me to put myself in the mind of the district court in connection with that issue... No, no, I'm not asking you to put yourself in the mind of the district court. We have a writing. We have a ruling from the district court, you know, and the district court seems to have found mistake. Yes, he found mistake. Not fraud. Mistake. Why isn't that sort of the end of the matter for you? Well, I think the district court... On the lamps plus. I'm sorry, sir. On the lamps plus. Why isn't that? I think the district court found, as we contended, that this was not simply an inadvertent mistake. This was, of course, a conduct engaged in by the plaintiff. Why does the mistake have to be inadvertent? Why can't it just be a mistake? Because the cases address that issue. The cases talk about inadvertence. They talk about, about... It's a mistake or it's not a mistake. And sometimes you say it's an inadvertent mistake. Sometimes you say it's a good faith mistake. If it's not a good faith mistake, it's not a mistake. That is to say, we sometimes add words before the word mistake, but there's still... It's just a mistake. So would be an intentional mistake. It is a mistake. It's the motivation, I suppose. No, I think we call that a lie. Yes. And, in fact, I believe that is what occurred in this case. I understand, but your belief doesn't matter. What matters are the findings of the district court. And I believe that the judge shared that belief. Well, he may have shared that feeling. I don't know what feelings you and the judge share. His findings seem to be that there was a mistake. The thing he actually wrote, the sort of legally applicable language, so any private feelings you might have had are, you know, both unverifiable and largely irrelevant. May I just take a moment and address another issue? I don't want to... Okay, go ahead. The conduct of this trial was bizarre in any number of ways. The fact is that when this trial actually took place, first of all, it was a consolidated trial between two separate plaintiffs. There was an issue of 700 and some odd requests for admissions, which had not been responded to by the defendants. I wanted to get to that. Can I ask you a question? Was it your firm that came in later and got the default? Yes, it was. When you moved to vacate the default, why, or did you, and if you didn't, why didn't you also move at that time to open up the request to admit so that you could answer them? We did it four days after the ruling. After the ruling on the default? Yes, because to do so prior to the ruling on the default really would have put us in a position where we were anticipating the court taking a particular response. The judges who were involved in this were frustrated by the case terribly, as I'm sure you can see. Those requests for admissions, within four days of the ruling on the default setting it aside, we made the motion. And the motion was summarily denied. But why weren't they made at the same time? We wanted to vacate the default against our client and all, we see this a lot, maybe it's different out here than in Chicago, but I doubt it. The motion usually is accompanied by we want to vacate any other technical defaults that might be out there. That was just not our approach to doing it that way. It may be a common approach in the Midwest. I'm not sure, but we simply wanted to get a ruling on the default first. Your position was that you couldn't answer the request because you were in default, so you had no standing to answer the request. Yes, sir, that's right. Now, let me ask you, on the same point now. Sure. In a sense, it seems to me the problem was you've now got three consolidated cases, and the judge does not allow you to answer, and so all these requests for admissions are taken to be admissions. As to one case, they come in, the judge instructs, now these should be allowed in for purposes of only one of these three cases, but your position is realistically that's impossible. And the jury inescapably heard all this stuff, was incapable of sorting it out, and while the miter might not have been fair with respect to the case in which you were not permitted to file the answer, that case is now gone. It's settled. And what we have is a case that's unrelated to the default, except that the request for admissions come in during the trial to which your current client was part,  Why were these requests for admissions so prejudicial, given that the district judge said to the jury, don't pay any attention to that? Well, the district judge didn't exactly say that. What he said was these requests for admissions were submitted to the defendant, and the defendant responded with admissions in these 713 instances. We approached the court, asked to discuss the issue. We said that it was really inappropriate to say these were submitted and they were affirmatively responded to. Yeah, no, I understand all that. My question is, tell me about why is this prejudicial to your client that they came in? The nature of the RSAs themselves were horrendous. They admitted the commission of crimes. They admitted the ownership of the rights. They admitted all sorts of nefarious things. If I were sitting on that jury, the first thing I would ask myself is, why in the world have I wasted 10 days listening to testimony when the judge tells me that all these things were admitted? And I believe that that is what the jury did. Now, and again, I recognize Judge Kaczynski is correct. What I believe is of little consequence. But having spent those rather uncomfortable 10 days in that courtroom, I can tell you that that jury had no more sense of the 8,000-page jury questionnaire and the specific issues such as the one you inquired about, the somewhat sophisticated issue of work for hire. They didn't have any such concerns in mind. One must look at, for example, the damage it was. Okay, I got your answer. Okay, thank you. I think that if, in fact, this court is convinced that the plaintiff should be entitled to make a claim based upon those copyrights, it seems to me that this court should then say, let's have both parties with an opportunity to put on their case, not just to have it decided by a procedural mechanism, which, again, with all due respect, was the result of a mistake made by the Defendant's counsel. Everybody here is assuming that you're dealing with a scoundrel who... wanted to move for JML on the right to publicity claim. I don't see why it would be waived. First of all, that kind of a claim, I think, is one which basically goes to the very issue of whether the complaint stated the cause of action. And when did you raise it? It was raised initially at the outset of the trial. The court inquired from the bench, do we have any issues? In fact, it was that very day that the court reinstated the copyright issues, and, in fact, the plaintiffs sought to dismiss the right of publicity issue, or claim. So that was the first time it was addressed in any context. It came up later when... Did you raise it after the trial? It made a peremptory ruling on the issue. I'm not sure if it... I'm not asking what the court did. I'm asking whether you... No, but I'm trying to recall the specific chronology of when that occurred. Let me get to you. But you do need to raise it after trial for it to be preserved. It was raised. You didn't seem so sure a second ago. No, no, no. I beg your pardon. I said I don't know when specifically it was raised. Was it raised after trial? Yes. After verdict? Yes. He granted the judgment on the copyright. Yes, that's right. We also... He threw out the copyright damages. That's right. We also addressed the issue of preemption. Same motion. I don't want him to speak. I believe it was either the same motion or a compendium of the motion, yes. Okay. I think you've had more than your time. Thank you. We'll hear from the other side. Good morning, Your Honor. Jens Kefke, appearing for appellees and cross-appellants. I think I'd like to start on the work for hire issues. First, registration alone cannot be evidence of fraud on a copyright office, particularly when the only two people that could possibly have ownership of this were the company and Mr. Gasper. All right. Let me just ask you some very pointed questions because I think this is a simpler issue. He did business under JJV, right, the corporation? What? I'm sorry? He did business under the corporation, correct? Yes. He was paid a salary by the corporation, correct? Yes. He was paid bonuses by the corporation, correct? Yes. The corporation paid his benefits as well, Social Security, withholding, that sort of thing, correct? Tax withholdings, yes. Yeah. Okay. The corporation also paid other creditors, right? With regards to the company. The actors. Not a personal creditor. No, no. The actors, the people who were involved in making the movie, correct? Yes. The actors, the grips, the lighting people, whatever, correct? Yes. The covers of these movies or DVDs had a copyright notice on it, right? Yes. Copyright notice said the copyright was held by the corporation, correct? That's what the copyright notice said, yes. Okay. So everybody who dealt with this enterprise would have believed that the copyright was held by the corporation, correct? Right? Well, then his main, I would say his main distributor at the time his films were made, JSI, would know because they were told that no, the copyright owner was Mr. Gaspar. And we're just fooling everybody else by putting the copyright notice on the front of the, on the cover, right? The copyright notice was a mistake. Well, I think it was more than a mistake because he admitted the reason he held the copyright in his own name was to avoid any consequences of the corporation going out of business. So if this corporation had gone out of business and left its other creditors like the actors and the grips and everybody else in the lurch and they would have looked towards the assets of the corporation to get paid, they would have found, oh, my goodness, it's Mr. Gaspar who owns the copyrights. So we don't have any, we don't have any assets to support the debts that we might be owed. And that's exactly what Mr. Gaspar wanted, isn't it? No, Your Honor. I mean, the, what his testimony was, was that the reason that he registered the copyrights in his own name was because he had an oral agreement with his company that he was going to register them because for purposes of his creative services, which were at the heart of the copyrights creation, meaning his directing, his producing, his writing, that for those purposes, he was going to hold on to those rights, meaning the copyrights. So that was his reason. But he was paid, he had one source of income from these films, and that was the corporation. In terms of income, but the asset, the value of owning a copyright, both from the standpoint of a tangible asset, it has great economic value. Well, yes, to royalties, and the royalties are paid to the corporation. There's more than royalties that are assets to a copyright. You can assign it to somebody else. You can sell it. You can do any number of things. You can do derivative works. That would all inure to the benefit of the copyright holder. That's all very hypothetical, isn't it, in this case? It isn't, because none of those things happened. He did assign the copyrights to a couple of them, to J.J.B. But the point being that there was a good reason for him to hold on to his copyright, not only from the standpoint of that's what happened, and he was the creative force behind the films, but also from an economic standpoint, because those things had value. But meanwhile, he's, again, he's publicizing to the world that he doesn't own the copyright. The corporation does. He made a mistake with the copyright notice. You're absolutely right. And as the Court's aware, post-1989 in the Berne Convention, copyright notices aren't required,  so it is a mistake, but it doesn't really go to the question of whether it is copyright. I want to focus on, so we've already talked about the fact that if there was a registration error here, it's lamps plus completely applies, and there's been no showing of fraud. And I also want to go to the point that Judge Fletcher made, that in order to determine the question of whether the work-for-hire statute applies, we first have to determine whether it's a work-for-hire. And simply because someone is paid as an employee, even tax withholdings alone, don't make somebody an employee for purposes of a work-for-hire situation. In fact, we cited the Respect Inc. case, where somebody, where a creative, creator of something was, tax withholdings were taken. Nevertheless, the Court determined that person, for purposes of work-for-hire, was an independent contractor and not an employee. Well, and it doesn't even need to be that distinction between independent contractor and employee. It could be part of his compensation as an employee that he receives the copyright. It could be, absolutely. The point is that one has to look, that it's not necessarily the labels that one puts on, one has to look at the relationship and look to the read factors to determine whether you've got an employee or an independent contractor situation. Those terms just help the Court distinguish between whether something is a work-for-hire or not a work-for-hire. Was there any evidence or testimony to support the notion that Judge Fletcher just articulated, that this was some part of his compensation for his creative work in directing and writing these films? I'm sorry. Was there evidence? Was there any evidence that this was part of his compensation, that he was to get the copyright? Yes. He testified. I can't, no. What he testified was, I kept the copyright in case my corporation got into trouble. And he said more than that. In anything, that same piece of testimony, if you read on, he talks about the fact that he did this, that he held on to, because he's the creative force behind the films. He wants to control the legacy of these films and be able to determine what's going to happen with them. And he knew they had value. So there was more than just that one statement. I want to talk quickly about preemption, which we haven't yet focused on, because I think it's important to know that there is a distinction between the copyright claim here and the publicity claim. And that distinction is that it wasn't, in terms of the publicity claim, the claim is that there was essentially a bootstrapping on the persona and name of Jules Jordan. That name has a, in this industry, has a reputation, a history associated over a multi-decade. There are tons of cases that say it's one thing to use the right to publicity claim independently, like in Wendt or in Banner-White, where you're using persona, but when you're using it, here what you've got is essentially piracy. What's alleged is a direct copying of the copyright of the work. And you can't bootstrap a right to publicity claim in that kind of situation, because what you're really doing is you are bringing a copyright claim. Well, let me give you an example to try to illustrate it, because I don't agree. I think... You don't think that's what the cases say? Well, I think the cases say that a persona or a name or a likeness is something distinct that's not copyrightable, and if that's the basis of your claim, then it's not preempted. And bear with me for a second, and I'll give you an example that I hope... Why don't you give me an example? Why don't you give me a case? A case where somebody's copyright, right of publicity claim was upheld, where the alleged infringement of the right to the right consisted of a copyrighted work, copying of the copyrighted work. Just give me a case. Well, I think if you look at the K.M.B. Matthews case, it's a copyrighted photograph, but the publicity claim is upheld because what the court said is what the publicity claim is based on is the likeness that's being violated, the publicity right associated with the likeness. So... But here the only thing he's complaining about is the pirating of these particular DVDs. No. Even if you look in the complaint, the complaint in the publicity claim says that the violation lies in the misappropriation of the name and likeness, and that appropriation, if you look on ER 2388 in paragraph 91, it says the appropriation was on or in products, merchandise, and or goods. And then at the pretrial conference, what does Jules Jordan counsel tell the court? He says the defendants violated the separate right by using the name and likeness of the persona of Jules Jordan. So it's separate and distinct from the copyright. How did they use it? By... When somebody goes into a store to buy a DVD, there's a mass of DVDs here. And when they choose to buy one, they choose to buy a known commodity. They see, oh, this is a Jules Jordan film. And they buy it on that basis. Let me give you an example. We all do this. If I go with my wife into a video store, and we're looking at DVDs, and I look at one, I say, honey, this is a Spielberg movie. Let's rent this one. We take it home. We watch it. If it turns out that this is a copyrighted counterfeit, assuming that Spielberg owns the copyright to this film, he can sue both for copyright infringement and for right of publicity. Because the only reason we bought that film was because it was his reputation and that associated with his persona that caused us to buy that film. Then there would never be preemption. He basically wiped out the whole document of preemption if that were the case. No, because you do have a situation like the Brown case, where you have a musical composition, a vocal composition, where a sample has been, or the Laws case, excuse me, where a musical composition, a vocal composition, has been taken allegedly without consent. And there the court said, since the entirety of your claim is based on something that's copyrighted, it's preemption. So if there is something distinct from the copyright claim, there shouldn't be preemption, just like in the Matthews case. In the K.M.B. Matthews case, again, clearly the photograph is a copyrighted work, and that's all that was claimed was that you took these photographs without our consent, but the court said no preemption because the likeness itself is being hijacked. That's even more important here in this industry, in this situation, because in fact this is how people sell films, and this is how people decide to buy these films. So if I were to pirate The Wizard of Oz and was sued by MGM, then Judy Garland can come along, assuming she was still alive, and sue me for the right of publicity along with the MGM suit for the pirating of the film itself. That's what you're saying. If her name is all over this. There she is on the yellow brick road. You know, that's why I want to buy the movie, because I like the little dog, you know. You're basically saying that these two actions always parallel each other, that the actors or the people in it always have a separate right to publicity of any film, because people go to buy movies because of particular actors in it or particular directors, so that you would never have a preemption in a movie context, basically. You would, and the Fleet case is a situation where essentially the claim was that by copying this film, and you copy my dramatic performance, and on that basis I should get both a copyright, I should get a publicity claim. Of course, no, that's a dramatic performance. You're just an actor, and as a result, that's preempted. But here, this is more than that. Wait a minute. He's just an actor. What are you saying there? Well, the point is that the actor, this actor's name didn't even appear on this film's, on the DVD of the film or anything. You're positing somebody who doesn't have a right to publicity. The situation you're positing is where there is no right to publicity. Nobody knows who the actor is. Exactly, exactly. But then there's no conflict. There's no preemption possible because there is no right to publicity. Now that it's preempted, it just doesn't exist. Well, they nevertheless tried to assert that in the Fleet case, and they lost. Here, it's different because there is a reputation. Did you understand Judge Gettleman's question? The one about Judy Garland? I'm sorry. I think what he's saying is, look, if you have somebody that has a right to publicity, so, you know, you posit an actor that doesn't, but assuming that there is some actor or producer or director or somebody that has a right to publicity associated with the copyright at work, you would never have preemption. You would if they were coextensive, like in the Laws situation. Ms. Laws has a right to publicity associated with her, but in that situation— Laws was a situation where she was a performance artist, she was a singer, but she assigned her copyright to the recording company. They then licensed a sample of her song to another artist who made a big hit out of it, and then Laws sues, saying, you violated my right to publicity by using this sample, which anyone who listened knew was her, but the only claim of publicity is based on the fact that this is her performance on this ten-second sample. There's nothing more, there's no additional element that brings it into the publicity realm. Let me step—oh, go ahead. Well, I was going to say, before your time runs all together, I want you to assume, you don't have to concede, I want you to assume that we're dealing with a copyright claim and that that's really what this case is, is a copyright case. Yes. Explain to me why your opposing counsel is wrong when he says that his client in this case was unfairly prejudiced by the admission into evidence of all of those admissions in the other case. I think it's fairly simple, Your Honor, because—and, Your Honor, I was focused on the prejudice—because there were a whole set of admissions served by our clients, by the Jules Jordan clients, that were also not answered, and where no motion to vacate was filed, and those admissions were also read into evidence, and they were equally damning. So, even if you go down the whole road and you say that— They admitted copyright infringement all the time? Yes. They admitted crimes? They admitted connections to the whole scheme of counterfeiting. They were a long list of them, and they were also read to the jury by Jules Jordan's counsel. So, even if you can somehow get through all the loops of finding an abuse of discretion here and going through all the standards, then there's still no prejudice because this information was already in front of the jury, based on our admissions, not the other case. Okay. I guess that means I'd better read them all. Let me ask you about the—the question I asked the opposing counsel about the Rasmussen claim. Do you think it is preserved? Was it properly erased before the district court, and was it preserved? The preemption claim, Your Honor? Yes. The preemption claim was not raised until the post-trial—in an opposition. It was not brought up until that time. I know—I wasn't asking for a description of what happened. Okay. I'm asking for your position as to whether it was preserved or not preserved under our law. We have pretty strict law that says that in order to erase a case like James' Walmart stores, it says that in order to preserve such a claim, you have to move for judgment as a matter of law before submission of the case to the jury. Then you have to renew it after trial. You have to renew the James' Walmart motion after trial. And we have on page 8 of the district court's order, the district court specifically says defendants should have moved separately to make this argument. This is the preemption argument. So it sounds to me like they didn't make it post-trial. I'm not sure whether they made it pretrial as it were required to. So I didn't see a word about this in your brief. So I was just wondering if you have a position on this. Maybe you waived it by not raising it. Your Honor, as I understand the James' decision, that the waiver occurs in terms of failure to do pre-verdict or post-verdict motions as to sufficiency of the evidence arguments. And we did assert that with regard to a number of their arguments. But I'm not sure whether it applies to an issue of law like preemption. I'll be honest with you. I'm not sure whether it applies or not. If we rule that copyright law preempted in this case, therefore there is no right to publicity claim, what happens then? Would we have to remand for a trial? No, Your Honor. There was a trial on copyright here. Remember, the copyright judgment was struck on JMOL. That was a complete trial of evidence. So then the court would reinstate the copyright judgment, which already has a number on it, and deal with our fees argument. So we would have to basically reverse the district judge's ruling on work for hire, correct? Yes. Okay. Was that issue, was the work for hire issue put to the jury in those terms? Was the jury asked? They were instructed about work for hire, yes. They were instructed. And they were given this long laundry list of questions. Were any of those questions directed towards the work for hire issue? They were directed towards ownership of the copyright. Within that, and they were told that one of the ways you own it is, or don't own it is if it's a work for hire. They were not asked a specific jury question on work for hire. They were asked specifically whether our clients own the copyright. So that would be the procedure. I do want to make one more point on preemption because another way to look at this is to say, if you had a DVD that was somebody else's film, another director, another adult movie director, and instead the defendant's completely counterfeited that film, but on that film said, directed, produced by Jules Jordan. In that situation, you know, again, we wouldn't have a copyright claim because it wasn't our work, but we would have a publicity claim because essentially they're trading on the name. And that to me illustrates that there is this additional element that exists in terms of the trading on the name that doesn't exist in terms of the copying of the film. Yeah, but that's a pure hypothetical that has nothing to do with this case. I mean, if Jules, if Gasper had put on his discs, directed by Steven Spielberg, Spielberg would then have a right to publicity claim against Gasper. But that's not what happened here. This is all Gasper all the time in a way. I mean, you know, this is. I agree. I acknowledge it's not what the facts here, but I'm trying to use it. His performance, his direction, everything was committed to a medium. Whether it was a film, in this case a DVD, it was committed to a medium. And isn't that what copyright law is supposed to protect? That's why you put the copyright notice on them, on this very medium, in order to tell the whole world this is a copyrighted work. How could we not hold that this is preempted? I just don't understand it. Again, I would have said the same thing, you know, about the K&B case or the Downing case. Those were copyrighted photographs. But nevertheless, the court said there's also something beyond that, the persona, the names, the likeness, that you have a right to pursue it. So I think there's an additional element, and that's all you need. If they had used Jules Jordan's name, picture, or something else in some other endeavor, perhaps in some other type of film, and held out to the world that it was produced by him or acted in it by him, then I could see where he would have a right to publicity claim. But when it's the very same work, I don't see it. I understand. I think that in this industry, that's where the publicity occurs. That's where the choice is made, is on that DVD. So that's where you're trading on the name. Okay. Thank you. Thank you, Your Honor. You know, when lawyers say 30 seconds, they usually don't mean it. Okay. We'll have a gong here, you know, after 30 seconds. I would simply ask the court to do this. There are damage issues addressed in the briefs. There are the issues of multiple damages, issues that would, again, become meaningful in addressing your question if, in fact, it is your inclination to overturn the copyright decision. I would ask simply that you please address those issues and recognize the need for the parties to approach a trial of these issues in a fair way, in a way that allows them to put their case before a proper finder of facts. Thank you for your time. Okay. 39 seconds. Not bad. Okay. Thank you, counsel. Case is argued with tense amendment.   Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.
judges: Gettleman, Kozinski, Fletcher W.